**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0821-25

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

MICHELE LINZALONE,

     Defendant-Respondent.

_____

        Argued January 26, 2026 – Decided July 29, 2026

        Before Judges Sabatino, Natali, and Bergman.

        On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 22-03-0420.

        Monica do Outeiro argued the cause for appellant (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

        Robin Kay Lord argued the cause for respondent (Robin Kay Lord, LLC, attorneys; Robin Kay Lord, of counsel and on the brief).

PER CURIAM

At approximately 10:13 a.m. on December 13, 2021, defendant Michele Linzalone called 9-1-1 to report she accidentally shot her sleeping husband in the head while playing with her gun. After three officers from the Middletown Police Department responded to defendant's home, defendant directed two of the officers to her dying husband upstairs, and the other officer, Sergeant Joshua Midose, directed defendant to the kitchen, where he asked several questions. This questioning of defendant during the first three to five minutes of the officers' entry into the home is the subject of this appeal.

We granted the State leave to appeal from the court's order which denied in part the State's motion to admit certain unwarned statements made by defendant to law enforcement. After considering the record, we affirm substantially for the reasons stated by the experienced trial judge in her oral opinion and conclude that defendant was in custody at the time of the challenged questioning and her statements do not warrant admission under the emergency aid exception.

I.

The State moved to admit all of the statements made by defendant on a 9-1-1 call and those made to the responding officers at the scene. In support of its motion, the State submitted the audio recording of the 9-1-1 call with an

2

accompanying transcript. Further, the court conducted a two-day evidentiary hearing where it considered the testimony from the 9-1-1 operator, Sergeant Joshua Midose, and Corporal Robert Shannon.

As noted, on December 13, 2021, defendant called 9-1-1 to report that she accidentally shot her husband in the head while "playing" with a firearm. The 9-1-1 call was recorded, and defendant stated she did not realize there was a bullet in the gun. The 9-1-1 operator asked questions to assess the emergency, during which defendant confirmed that her husband was still alive, and described him as "just staring" and "breathing lightly," with his chest "rising and falling." At the operator's direction, defendant applied a cloth to the profusely bleeding wound and requested that emergency personnel be sent "right over."

Three uniformed officers responded to the residence. As defendant opened her door to let the first responding officer, Corporal Robert Shannon, into her home, he immediately asked defendant, "Ma'am, do you have the gun?"; "Anyone else here with you?"; and "Where is [your husband]?" As Corporal Shannon instructed defendant to move her dog, defendant stated no one else was home with her, and the gun and her husband were upstairs.

Corporal Shannon and another officer went upstairs to render aid and Sergeant Midose "directed [defendant] to sit down [in the kitchen]," where he

A-0821-25

asked her, "Where's the firearm at?" and "Are there any other firearms inside the house?" Sergeant Midose then asked, "What happened today?"

After defendant responded to Sergeant Midose that she was playing with her firearm, he continued his questioning over the next three to five minutes and asked what "playing meant, what exactly that was," "when the incident did occur," and after learning that the defendant had waited 20 to 30 minutes before calling 9-1-1, asked her the reason for the delay, to which the defendant stated she needed to get dressed and brush her teeth. Throughout this period, the defendant was seated in her kitchen, separated from the rest of her home by a removable dog gate, and Sergeant Midose remained standing a few feet away. Sergeant Midose later testified he did not alert the two officers upstairs to any of her answers to these questions in light of the fact that they located the gun and were "operating under the same fact pattern that [he had]."

Following this exchange, Sergeant Midose transitioned the conversation to other topics beyond the incident such as happenings in the community, the police department, and the upcoming holidays. The entire conversation lasted about forty-five minutes. During this time, while defendant remained in the kitchen, other law enforcement officials and emergency medical technicians arrived. Those individuals did not speak directly to defendant but were in and

A-0821-25

out of the house to render aid to the victim. At one point, officers entered the kitchen to update Sergeant Midose and emergency services informed defendant that her husband had died.

While defendant was not handcuffed at any point, Sergeant Midose never administered Miranda[1] warnings, and he later testified at the suppression hearing that defendant was not free to leave the residence. Defendant was free, however, to move about in the kitchen and did so, getting herself a glass of water. He further testified that his conversation with defendant was "very straightforward." He described defendant as calm throughout his encounter, and she had no problems speaking to him.

After considering the 9-1-1 operator and responding officers' testimony as well as the written submissions and arguments of counsel, the court issued a September 11, 2025 order in which it granted the State's motion in part and denied it in part. In its accompanying oral decision, the court explained that it granted the State's application with respect to defendant's statements on the 9-1-1 call and defendant's immediate statements to the responding officers "regarding the location of the victim, the location of the gun, and whether there were any other firearms or people in the house" pursuant to the emergency aid

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0821-25

doctrine. The court, however, denied the State's motion with respect to the statements subsequently made to Sergeant Midose in the kitchen "in response to questions regarding what happened, and all subsequent statements made [as] . . . [was] subject to custodial interrogation for which <u>Miranda</u> warnings were required."

The court noted that it found all witnesses credible. It then considered that defendant did not contest the admissibility of her statements to the 9-1-1 operator and after concluding the statements were made voluntarily, deemed them admissible at trial.

With respect to defendant's statements in her home, it rejected the State's application as a "one-sized-fits-all proposal," and instead decided "to consider the situation as it unfolded." Specifically, the court found that defendant's answers to Corporal Shannon's questions, "Ma'am, do you have the gun"; "anyone else here with you"; and "where is [the person shot]," were admissible pursuant to the "emergency aid" exception. Likewise, the court found that defendant's answers to Sergeant Midose's questions, "where's the firearm at," "are there any other firearms inside the house," and "[is] anybody else home with you," were also admissible pursuant to that same exception as the questions were necessary to secure police or public safety.

A-0821-25

As noted, the court, however, concluded that defendant's subsequent statements to Sergeant Midose in the kitchen in response to his questions regarding "what happened today," "what playing [with the gun] meant," "when [did] the incident occur," and "why did she wait so long to call [9-1-1]" were inadmissible and not within the emergency aid exception. The court explained that based on the "totality of the circumstances surrounding defendant's restraint" these questions "constituted a custodial interrogation," and thus, Miranda warnings were required.

In reaching its conclusion that defendant was in custody, the court found significant that defendant was directed to a confined kitchen area, outnumbered by armed officers, not free to leave as conceded by Sergeant Midose at the suppression hearing, and subjected to prolonged questioning. The court determined that a reasonable person in defendant's position would have believed her freedom was curtailed and because the police failed to provide Miranda warnings prior to this interrogation, all statements made in response to these subsequent questions were deemed inadmissible.

Before us, the State makes the following arguments, and we address and discuss them in the manner in which we resolve them. First, the State argues the court erred in finding that the defendant was in custody for Miranda purposes

7

during the initial on-scene questioning as the circumstances did not amount to a formal arrest or its functional equivalent, emphasizing that defendant was not handcuffed, was not told she was under arrest, and was permitted to move about her kitchen. It further maintains the allegedly brief, immediate questioning upon police arrival was part of a valid investigative detention, analogous to a Terry[2] stop, and did not constitute a de facto arrest.

The State further argues that the trial court misapplied the emergency aid doctrine by improperly limiting its scope to only the first few questions regarding the location of the firearm and the presence of others in the home. According to the State, all questions posed within the first three to five minutes—including inquiries about what happened, the meaning of "playing with the gun," and the timing of the incident and the 9-1-1 call—were motivated by officer's "duty to assist his fellow officers and emergency responders in safely providing aid to the victim" and thus should have been admitted under the emergency aid exception consistent with State v. Boretsky, 186 N.J. 271 (2006).

II.

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

A-0821-25

We begin our discussion by reciting the applicable standard of review, followed by the applicable substantive constitutional legal principles that inform and guide our analysis. When we review a trial court's decision on a suppression motion, "we generally defer to the factual findings of the motion court when they are supported by credible evidence in the record." State v. Sims, 466 N.J. Super. 346, 362 (App. Div. 2021). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). "Deference to a trial court's factual findings is appropriate 'because the trial court has the "opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy."'" Sims, 466 N.J. Super. at 362-63 (quoting State v. S.S., 229 N.J. 360, 374 (2017)). However, to the extent that a "trial court determination involved legal conclusions, we review those conclusions de novo." Ibid.

"[W]hen a defendant challenges a statement procured by a law enforcement officer without the benefit of Miranda warnings[,]" the State bears the heavy burden of proving "beyond a reasonable doubt" that the statement is admissible. State v. Hubbard, 222 N.J. 249, 268 (2015) (citing State v. Clausell,

121 N.J. 298, 352–53 (1990)). Even when <u>Miranda</u> warnings are properly administered, "the State bears the burden of proving beyond a reasonable doubt that a defendant's confession is voluntary and not resultant from actions by law enforcement officers that overbore the will of a defendant." <u>Ibid.</u> (citing <u>State v. Hreha</u>, 217 N.J. 368, 383 (2014)); <u>State v. Galloway</u>, 133 N.J. 631, 654 (1993). "Determining whether the State has met that burden requires a court to assess 'the totality of the circumstances, including . . . the nature of the [custodial] interrogation.'" <u>Hreha</u>, 217 N.J. at 383 (quoting <u>Galloway</u>, 133 N.J. at 654).

Under the Fifth Amendment to the United States Constitution, N.J.S.A. 2A:84A-19, and N.J.R.E. 503, no person shall be compelled to be a witness against himself or herself in a criminal case. In <u>Miranda</u>, 384 U.S. at 444-45, the United States Supreme Court held that as a prerequisite to the admissibility of a suspect's statement, police must inform the suspect of the right to remain silent and the right to the presence of an attorney and tell the suspect that any statement made may be used as evidence against him or her. <u>Miranda </u>warnings are "prophylactic measures designed to ensure that a suspect's decision to speak to the police is knowing and voluntary." <u>State v. Burris</u>, 145 N.J. 509, 519 (1996).

10

Miranda warnings must be given prior to "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." Miranda, 384 U.S. at 444. Thus, the requirement is "triggered only when a person is in custody and subject to questioning by law enforcement." Ahmad, 246 N.J. at 610 (citing State v. Wint, 236 N.J. 174, 193 (2018)).

Custody does not require a formal arrest or the use of handcuffs or other physical restraints, and "may occur in a suspect's home or a public place other than a police station." State v. Lutz, 165 N.J. Super. 278, 285 (App. Div. 1979) (quoting State v. Godfrey, 131 N.J. Super. 168, 175 (App. Div. 1974), aff'd, 67 N.J. 267 (1975)). In that regard, the level of restraint placed on an individual's freedom of movement must be "of the degree associated with a formal arrest." State v. Erazo, 254 N.J. 277, 298 (2023) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

Thus, "[w]hether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernable." State v. Scott, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on 'how a reasonable [person] in the suspect's position would have understood his situation,'" rather

than "'on the subjective views harbored by either the interrogating officers or the person being questioned . . . .'" Hubbard, 222 N.J. at 267 (first alteration in original) (first quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984); and then quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Some factors to be considered include "the time and place of the interrogation, the status of the interrogator, [and] the status of the suspect" or other individual being questioned or spoken to. State v. P.Z., 152 N.J. 86, 103 (1997). A court should also consider "the nature and degree of pressure applied to detain the suspect, the duration of the questioning, the physical surroundings, and the language used by police." State v. Timmendequas, 161 N.J. 515, 614 (1999) (citing State v. Smith, 307 N.J. Super. 1, 9 (App. Div. 1997)).

Because non-custodial questioning does not involve the same "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," Miranda, 384 U.S. at 467, "[t]he rights set forth in Miranda are not implicated 'when the detention and questioning is part of an investigatory procedure rather than a custodial interrogation,' or where the restriction on a defendant's freedom is not of such significance as to compel the conclusion that his liberty is restrained." Smith, 307 N.J. Super. at 9 (citations omitted) (quoting State v. Pierson, 223

12

N.J. Super. 62, 66 (App. Div. 1988)), certif. denied, 153 N.J. 216 (1998). Thus, Miranda warnings are not generally required before "'[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process[,]' unless the totality of the objective circumstances" suggest the individual was otherwise in custody. Smith, 374 N.J. Super. 425, 430 (App. Div. 2005) (alterations in original) (citation omitted) (quoting Miranda, 384 U.S. at 477).

"When considering the need for Miranda warnings before questioning in a private residence, our courts have not viewed the home as a location so isolated or dominated by the police as to lead the reasonable person to conclude he or she is in custody or in danger of abuse." Id. at 432. Though "police action subsequent to entering [a] residence is likely to involve some restraint on the occupants' freedom of action," we compared the situation to "field investigations of suspicious conduct" and "traffic stops," two circumstances where police are "not required to give Miranda warnings before asking questions reasonably related to dispelling or confirming suspicions that justify" a brief "detention." Ibid. In doing so, we held that, absent badges of formal arrest or its equivalent, in-home questioning is insufficient to rise to the level of custody necessitating Miranda warnings. Id. at 431-33.

Interrogation need not involve "express questioning"; the term also encompasses "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Still, "simply because someone is questioned at a police station[] by police officers[] does not mean they are 'in custody.'" Erazo, 254 N.J. at 299. "Nor is it dispositive whether police consider someone a 'suspect,' 'person of interest,' or 'witness.'" Ibid.; see, e.g., State v. Brown, 352 N.J. Super. 338 (App. Div. 2002) (finding that just because a person being interviewed by police may be the focus of a criminal investigation, does not necessarily mean that that person is in custody); State v. Keating, 277 N.J. Super. 141, 148 (App. Div. 1994) ("What the police had in mind . . . is not the issue; the issue is whether defendant reasonably believed that he was in custody when being questioned."). Nonetheless, "an officer's . . . beliefs concerning the potential culpability of the individual being questioned, may be . . . [a] factor[] that bear[s] upon the assessment whether that individual was in custody[;] [but] only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." Stansbury v. California, 511 U.S. 318, 325 (1994).

Even when the indicia of custody exist, the Court has recognized "a safety exception to Miranda." O'Neal, 190 N.J. at 618. Thus, where there is "an 'objectively reasonable need to protect the police or public from any immediate danger associated' with a weapon," Miranda warnings are not required prior to questioning. State v. Melendez, 423 N.J. Super. 1, 24 (App. Div. 2011) (quoting O'Neal, supra, 190 N.J. at 618), certif. denied, 210 N.J. 28 (2012). However, "the police must specifically frame the question to elicit a response concerning the possible presence of a weapon." O'Neal, 190 N.J. at 618.

Similarly, our Supreme Court has recognized an emergency-aid exception to Miranda's requirements. State v. Boretsky, 186 N.J. 271, 281 (2006). While typically "applied to override the normal warrant requirement for searches and seizures," the Court concluded that "[t]he public safety concerns implicit in the [emergency aid] doctrine similarly support the reason for the . . . exception to Miranda." Ibid. "When public officials question an individual at the site of an emergency in which life or personal safety hangs in the balance and obtain a responsive statement that may be indicative of guilt, that consequence is secondary to the need to protect public safety," and police are not required to give Miranda warnings before asking questions in furtherance of their duty to render emergency aid. Ibid.

15

To decide whether this exception applies to statements made before an officer administers Miranda warnings, courts rely on the first two prongs of the test for the emergency aid doctrine as it is applied in the warrantless search context. Id. at 280 ("The first two prongs of that test assist in the present analysis."). Those prongs provide: (1) "[t]he public official must have an objectively reasonable belief, even if later found to be erroneous, that an emergency demands immediate assistance in order to protect or preserve life, or to prevent serious injury;" and (2) "the provision of assistance must be the prime motive for the public official . . . ." Boretsky, 186 N.J. at 280 (citing State v. Cassidy, 179 N.J. 150, 161 (2004)).

Against these principles, we are satisfied the State has not met its high burden to establish beyond reasonable doubt the admissibility of the disputed statements, in light of "the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors," surrounding defendant's restraint.[3] P.Z, 152 N.J. at 103.

_____

[3] We do not address those statements to which the State has not appealed, specifically defendant's statements in the 9-1-1 call and her immediate responses regarding the location of the victim and the gun and whether there were any other firearms or people in the house. See Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its

Based on the judge's factual findings which are amply supported by credible evidence in the record, we are satisfied that "the indicia of custody," State v. Choinacki, 324 N.J. Super. 19, 43 (App. Div. 1999), demonstrate that defendant was effectively in police custody when she was questioned regarding "what happened today," "[w]hat does it mean that you . . . play[ed] with the gun," "[w]hy did it take . . . so long to call the police," "when did the incident occur," and "[w]hy did it take . . . so long to call the police."

While we recognize defendant was in her home, not handcuffed, and free to move about the limited area of the kitchen, we are convinced "no reasonable person in [defendant's] position would have understood the situation" differently than Sergeant Midose's credible testimony that defendant was, in fact, not free to leave the kitchen and thus subject to "a de facto arrest." Smith, N.J. Super. at 432. At the point Sergeant Midose directed defendant to the kitchen and questioned her for the next several minutes, the "objective circumstances" were that a potential homicide occurred on site involving a firearm, the victim was near death, officers were upstairs rendering aid, and defendant identified herself

---

brief); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026) ("[A]n issue not briefed is deemed waived."). Accordingly, we limit our analysis to those later statements in response to Sergeant Midose's four questions in the kitchen.

A-0821-25

as the sole perpetrator, which clearly casted immediate suspicion upon her. Hubbard, 222 N.J. at 271. The fact that defendant remained in the kitchen as Sergeant Midose stood feet away from her for the next forty-five minutes all but confirms "the coercive atmosphere and restraint of freedom that comprises a custodial interrogation," P.Z., 152 N.J. at 103, particularly as other officers and emergency services came in and out of the "police-dominated atmosphere" of the house, Smith, N.J. Super. at 433.

As the experienced trial court judge found, the record supports that three-armed officers immediately responded to defendant's 9-1-1 call, in which she expressly told the operator that she had been playing with a gun and shot her husband. Upon arriving at the home and after the two officers went upstairs to secure the scene, Sergeant Midose directed her to sit down in the kitchen, where over the course of the next several minutes, he asked her several questions that in the moment, he did not relay to the other officers. Once Sergeant Midose transitioned the conversation to topics not related to the incident, at least the two other officers present and other emergency responders moved around the house including entering the kitchen to discuss the status of the investigation and inform defendant that her husband died, as defendant stayed seated under the watchful eye of an armed police officer for the next forty-five minutes.

A-0821-25

We are also satisfied defendant's statements were the product of interrogation, which the State appears to not dispute. In any event, Sergeant Midose's questions regarding what happened, what did she mean by playing, when did the incident occur, and why did she wait so long, was "express questioning" beyond "mere investigative questioning" in light of the fact that defendant, from the beginning, identified herself as the person who had shot her husband when she voluntarily called 9-1-1. Hubbard, 222 N.J. at 271. Once in the kitchen as the officers rendered aid and secured the scene, the record supports Sergeant Midose, who was aware of defendant's admissions on the 9-1-1 call and her responses to Sergeant Midose and Corporal Shannon's initial questions, began asking defendant questions related to defendant's potential culpability and "were likely to elicit an incriminating response." Id. at 267.

We reject the State's reliance on Smith, 374 N.J. Super. at 419; State v. Coburn, 221 N.J. Super. 586, 595-98 (App. Div. 1987); and State v. Gandhi, 201 N.J. 161, 199-201 (2010), to support its contention that defendant was not in custody based on the distinctive facts in the record. See also Erazo, 245 N.J. at 300 (admitting the defendant's statements following a voluntary interview with officers at the police station where the defendant sat unrestrained along with

A-0821-25

others, provided general biographical information and his general whereabouts for the day, and was offered food, water, and a cigarette break).

In Smith, our court admitted a defendant's statement to a responding officer in his bedroom because, in the moment, "defendant's bedroom [was] occupied by one officer and defendant for moments of non-threatening questioning."  374 N.J. Super. at 435.  Following a domestic violence report by his wife, three officers responded to the defendant's residence.  Id. at 429.  "In order to acquire more information, 'get both sides of the story,' and see whether defendant was injured, [an officer] went upstairs alone."  Ibid.  After entering the defendant's bedroom, the officer found the defendant in his bed, walked to the side of the bed, shined a flashlight in his face, and asked him, "what happened" and whether he choked his wife.  Id. at 429.  The entire encounter took a "matter of moments," and specifically, the questioning "took a matter of seconds."  Ibid.

In Coburn, our court admitted the defendant's statements to an officer during a conversation that took place in his home in the presence of his sister and her friend.  221 N.J. Super. at 590.  In that case, police received a call from the victim's father that a homicide had been committed at a designated residence and later received information that it may have been committed by a man named

A-0821-25

Coburn. Id. at 591. When an officer arrived on the scene, he observed two women and a man, and he asked the man if his name was Coburn. Ibid. Without advising the defendant of his Miranda rights, the officer proceeded to question him. Ibid. Ultimately, we determined that the defendant was not in custody at the time, in light of the facts that the interrogation took place in his home in the presence of his sister and her friend, the questioning "took only a short time," he was "never restrained in any manner," and "nothing was said or done to the defendant to suggest that he was not free to leave." Id. at 596. We further noted that even though the officer had planned to detain the defendant, "that subjective determination was never communicated." Ibid.

In Gandhi, our Court admitted the defendant's statement in light of the fact-finding nature of the officer's inquiry as he responded to a dynamic situation where "anything could have happened." 201 N.J. at 201. In that case, an officer responded to the victim's family home following a call from the victim's mother regarding the defendant's persistent stalking. Id. at 200. Upon arrival at the scene, the officer "conducted a by-the-book domestic disturbance investigation and only determined that defendant should be arrested following his discussion[s]" at the scene, including a brief conversation with the defendant

21

outside the home where the officer did not inform him of his <u>Miranda</u> rights. <u>Id.</u> at 201.

Unlike the circumstances in <u>Smith</u>, <u>Coburn</u>, and <u>Gandhi</u> that lacked the badges of a formal arrest or functional equivalent, we are satisfied the circumstances here constituted a custodial interrogation, particularly once Sergeant Midose was alone in the kitchen with defendant, several minutes after the officers' arrival at the potential homicide scene, and for which he testified she was not free to leave following her unambiguous admissions on the 9-1-1 call. And, unlike the officer in <u>Smith</u> whose questioning occurred over the course of seconds in his bedroom, Sergeant Midose's initial and follow-up questioning took place over the course of more extended period of time and after defendant already voluntarily identified herself as the sole perpetrator and followed him into the kitchen where she stayed for forty-five minutes. Further, unlike the defendant in <u>Coburn</u> who was questioned by the officer in the presence of other people not involved with any alleged crime, defendant was by herself, with no doubt whether she shot the weapon, as Sergeant Midose instructed her to sit in the enclosed and separated kitchen for questioning that addressed her potential culpability. Finally, unlike the officer in <u>Gandhi</u> who questioned the defendant outside the home for a few moments, Sergeant Midose

22

stayed with defendant for forty-five minutes as officers and emergency services arrived at the potential homicide scene.

In light of our conclusion that defendant was in custody and subject to interrogation, we next address the State's contention that the court improperly concluded that Sergeant Midose's subsequent questions asked in the kitchen were not admissible under the emergency aid exception. As noted, to support its contention that Sergeant Midose's statements fall within the emergency aid exception, the State primarily relies upon Boretsky, 186 N.J. at 280.

In Boretsky, the Court determined that the officers' on-scene questioning of the defendant and his subsequent responses were admissible under the emergency aid doctrine. 186 N.J. at 280. In that case, officers responded to an emergency 9-1-1 call in which the caller reported an attempted suicide. Id. at 273. Upon the officer's arrival at the residence, the defendant "attempted to hand" the officers his phone and told them to "speak to [his attorney]," while his wife laid motionless and bloody on the couch. Ibid. As the officers provided aid to his wife, they asked the defendant "when he last spoke to or heard from his wife." Id. at 276. After more officers arrived, the defendant continued to request the officers speak to his attorney. Ibid. The defendant sought to suppress his responses to the officers' initial question before he was informed of

23

his <u>Miranda</u> rights, and additional statements he made after officers provided warnings.  <u>Ibid.</u>

Applying the two prongs of the emergency aid exception to the admission of defendant's statements, the Court first determined with respect to prong one, whether officers have an objectively reasonable belief that an emergency demands immediate assistance to preserve life, that the officers only "appeared at [the defendant's] home to provide emergency aid in response to a report of an attempted suicide."  <u>Id.</u> at 281.  With respect to prong two, the provision of assistance must be the public official's prime motive, the court concluded the officers' motivating purpose to render aid to the victim "shaped the officer's initial interactions with [the] defendant, the only person at the scene who was able to answer questions and could help in the assessment of the needs and status of the victim before medical assistance arrived."  <u>Ibid.</u>

We reject the State's reliance on <u>Boretsky</u> and are convinced Sergeant Midose's objective reasonable belief and his prime motive regarding his subsequent questions in the kitchen were not related to the provision of emergency aid.  While we acknowledge the officers here responded to a 9-1-1 call placed by the defendant that she had shot her husband in the head and required aid, at the point Sergeant Midose sequestered her in the kitchen, two

other officers were, in fact, upstairs providing aid to the victim, and there was no indication anyone else was in the home or any other guns in the home other than the previously-identified firearms. The record supports Sergeant Midose was aware of all of these facts in light of the 9-1-1 call and his and Corporal Shannon's initial questions, and indeed, he testified his primary motive in asking these questions was "fact-finding." Accordingly, we agree with the court that Sergeant Midose's questions were not to provide emergency aid, but were focused on "specifically what happened," and thus, "[t]he statements made after . . . the officer's initial inquir[y] do not fall under the emergency [aid] doctrine," particularly after he had already "learn[ed] where the weapons were and whether anyone else was in the home."

To the extent we have not specifically addressed any of the parties' remaining arguments, it is because we have considered them and concluded they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M. C. Hanley

Clerk of the Appellate Division

25